JDL:TJS
F. #2012R00951

# 12 MISC 493

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION OF THE
UNITED STATES OF AMERICA FOR AN ORDER
AUTHORIZING THE INSTALLATION, USE,
MONITORING, REPAIR, REPLACEMENT AND
REMOVAL OF:

ONE MOBILE GPS TRACKING DEVICE IN OR
ON A GREY 2012 MERCEDES BENZ ML 350,
VIN #4JGDA5HB5CA011779

FILE UNDER SEAL

AFFIDAVIT IN
SUPPORT OF APPLICATION

- - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

      EDWARD PIESZCHATA, being duly sworn, deposes and states

as follows:

      1.  I am a Special Agent of the Drug Enforcement

Administration("DEA") assigned to the New York Drug Enforcement

Task Force.

      2.  I have participated in numerous investigations of

drug trafficking organizations during the course of which I have

(a) conducted physical and wire surveillance; (b) executed search

warrants at locations where drugs, drug proceeds and records of

narcotics and money laundering transactions have been found;

(c) reviewed and analyzed numerous recorded conversations and

records of drug traffickers and money launderers; (d) debriefed

cooperating drug traffickers; and (e) conducted surveillance of

individuals engaged in drug trafficking.  Through my training,

education and experience, I have become familiar with (a) the

manner in which controlled substances are illegally acquired, transported, stored and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

3.   I submit this affidavit in support of an application for an order pursuant to Federal Rule of Criminal Procedure 41(b), Title 18, United States Code, Section 3117, and Title 28, United States Code, Section 1651, authorizing the installation and monitoring of a Global Positioning System ("GPS") mobile tracking device to be installed by trained technicians, or authorized representatives of DEA in or on the following vehicle: A GREY 2012 MERCEDES BENZ ML 350, VIN #4JGDA5HB5CA011779 registered to Arleana B. Pierre, 116-28 Lovingham Place, St. Albans, New York 11412, with New York License plates FCM4328, being used in furtherance of drug trafficking committed by FLETCHER SALEEM VOISIN and others (the "SUBJECT VEHICLE"), which is currently located in the Eastern District of New York, in order to monitor the movement of the SUBJECT VEHICLE (the "Requested Information"), for a period of forty-five (45) days.

4.   I am familiar with the facts and circumstances of the investigation set forth below through discussions with other agents and officers of DEA and other law enforcement agents, which includes information provided by confidential informants,

2

and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another DEA agent, or law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance. Since this affidavit is being submitted for the limited purpose of securing an order authorizing the installation and use of a GPS mobile tracking device, I have not included details of every aspect of the investigation. Facts not set forth herein are not being relied on in reaching my conclusion that the requested order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

5.    Probable cause exists to believe that the Requested Information will lead to evidence of offenses involving the distribution of, and possession with intent to distribute, controlled substances, conspiracy to do the same and attempts to do the same, in violation of 21 U.S.C. §§ 841 and 846

3

(collectively, the "TARGET OFFENSES"), as well as the identification of individuals who are engaged in the commission of these offenses.

6. In addition, the Requested Information is relevant and material to an ongoing investigation.

7. For the reasons set out in this affidavit, there is probable cause to believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed by FLETCHER SALEEM VOISIN and others known and unknown. Further, there is probable cause to believe that VOISIN and others unknown, intend to use the SUBJECT VEHICLE to commit the TARGET OFFENSES.

8. No prior applications for a warrant authorizing the installation and monitoring of a GPS mobile tracking device for the same vehicle have been submitted.

<strong>PROBABLE CAUSE</strong>

<u>Background</u>

9. In October 2011, Special Agents of the DEA began investigating FLETCHER SALEEM VOISIN, who was believed to be responsible for the smuggling and transportation of multi-kilogram quantities of cocaine from Arizona to New York.

10. On numerous occasions, throughout June and July, VOISIN was observed driving the SUBJECT VEHICLE. As detailed more fully below, the SUBJECT VEHICLE has also been used by

4

others to pick up narcotics.

## Arizona Wire Interceptions of VOISIN

11.    During the course of the investigation, telephone communications during which VOISIN discusses narcotics trafficking with a different Arizona-based cocaine supplier have also been intercepted.  On April 10, 2012, DEA agents received court authorization from Pima County Superior Court in Arizona to intercept wire communications of cellular telephone 520-258-3182, which is being utilized by CARLOS SAVE-RENDON, a cocaine supplier of VOISIN.  Pursuant to this authorization, agents intercepted wire communications relating to narcotics transactions between VOISIN and SAVE-RENDON.

12.    The following are among the wire communications that have been intercepted between SAVE-RENDON and VOISIN.  These communications are presented in summary and in part.

a.    On April 11, 2012, SAVE-RENDON called VOISIN. SAVE-RENDON and VOISIN discussed an individual known as "99", who was later identified as BERNARDO CAMACHO-RAMIREZ.  A confidential informant ("CI 2")[1] has indicated that "99" is a truck driver who transports cocaine from Arizona to New York for the drug trafficking organization.  VOISIN and SAVE-RENDON had the following conversation, referring to "99":

---

[1]    CI 2 has provided information in this investigation that has proven to be reliable and has been corroborated by independent evidence.

VOISIN:    "Here is the thing, all right?  He wants to get . . . um . . . let's say five, but he says 'like just in case' well, he will, he already gave him five so he already has five, you know what I mean? And it's like . . . I don't know why like he wants that upfront but he is pretty much getting paid before."

SAVE-RENDON:    "Yeah, before the job, yeah."

VOISIN:    "Yeah.  So it's like half and half I mean he asked us to loan the stuff, but I think he should just be good with it, whatever."

I believe that VOISIN and SAVE-RENDON were discussing payment to CAMACHO-RAMIREZ in return for CAMACHO-RAMIREZ transporting cocaine to New York.  Later in the call, VOISIN states, "yeah, um . . . it was a total of um, twelve, but I told him nine."  I believe that when VOISIN stated that it was a total of twelve, but he told him nine, he was indicating that he had told CAMACHO-RAMIREZ that he would be transporting nine kilograms of cocaine, but he was, in fact, transporting twelve kilograms of cocaine.  I know from my training and experience that drug traffickers often pay individuals who transport narcotics based on the total weight of the narcotics to be transported.  Therefore, misrepresenting the amount of cocaine CAMACHO-RAMIREZ was transporting would allow VOISIN and SAVE-RENDON to pay him less for the trip.

        b.  On April 20, 2012, SAVE-RENDON again called VOISIN.  During this communication, VOISIN and SAVE-RENDON had the following exchange in Spanish:

VOISIN:    "It'll be like, not this weekend or next weekend, so it you could come up from me.  I

6

won't have you probably, uh, by the middle of
the week.  I have almost everything already.
Know what I mean?"

SAVE-RENDON:  "Yeah.  No, but I just wanted to pay, pay the
loan.  The loaner so I can uh, get you
another one like tomorrow . . . because he
might leave tomorrow, because he might leave
Sunday."

VOISIN:  "Yeah, I hear you.  I hear you.  You already
saw '99', right?"

SAVE-RENDON:  "No, I'm gonna see him right now, in uh two
hours."

VOISIN:  "All right.  Cool, cool all right . . . I'm
getting five, okay?"

I believe VOISIN is telling SAVE-RENDON when he will provide him

money for cocaine and that SAVE-RENDON is indicating that he

needs the money to pay off a loan used to purchase cocaine.  I

believe SAVE-RENDON is also indicating that a shipment of cocaine

is likely to leave tomorrow or Sunday.  I believe that when

VOISIN indicated that he was "getting five" he meant five

kilograms of cocaine.

            c.  Approximately ten hours later, still on April

20, 2012, SAVE-RENDON again called VOISIN.  They had the

following conversation:

SAVE-RENDON:  "Hey, ahh, do you send for four?"

VOISIN:  "I sent for five."

[Later in the call]

SAVE-RENDON:  "I'm gonna meet them later."

VOISIN:  "For the loan."

7

SAVE-RENDON:      "Yeah."

VOISIN:           "All right.  If, if I probably I might be
                  able to send out like half of it . . . more
                  than likely about, probably like about . . .
                  I should be able to send out."

[Later in the call]

SAVE-RENDON:      "I'm gonna, I'm gonna send you four."

VOISIN:           "Alright that would be cool.  So I'm gonna
                  try and get out at least yeah . . . get all
                  that out tomorrow then, no problem."

I believe that SAVE-RENDON and VOISIN are discussing the shipment
of cocaine and payment for cocaine.  I believe that when SAVE-
RENDON and VOISIN discussed "four" and "five" they were referring
to four or five kilograms of cocaine that would be shipped to
VOISIN.  I believe that they were also discussing when VOISIN
would send payment to SAVE-RENDON.

          d.  On May 8, 2012, SAVE-RENDON contacted VOISIN
on a different telephone ("TELEPHONE 2") using Nextel Direct
Connect two-way radio via that telephone's UFMI number.  During
the conversation, VOISIN indicated that he "got to it with what's
his name? '99'" and states that he has "a little problem right
now."  VOISIN and SAVE-RENDON then had the following exchange:

VOISIN:           "How many was it that you sent over?"

SAVE-RENDON:      "Thirteen."

VOISIN:           "Out of all those . . . it had . . . well
                  each one of them was short.  Each one of them
                  was short, okay?  All right?  It had four of
                  them.  I got 980.  Okay?  980 and four of
                  them.  The rest of them was 930, 940, and

that's crazy?"

SAVE-RENDON:    "What? Which ones were they?"

VOISIN:         "The ones that was real short was ones that
                kinda . . . it was wrapped in a . . . in the
                . . . in the grey . . . the grey tape. The
                grey duct . . . the duct tape, and they were
                kind of twisted and . . . and . . . and bent
                up. You know what I'm saying? those are the
                ones that was real short. Real short. You
                can actually see where those niggas cut it
                and dig . . . dig . . . dig shit out. You
                know what I'm saying? I don't know who it
                is. If you all did it, or those niggas did
                it, but that is fucked up.

Later in the call, VOISIN stated:

VOISIN:         Well, this is the last time I'm thinking I'm
                fucking with Primo man. Because yo dude,
                almost all of them others was fucking cut
                open, digged out dog. I'm talking a mad
                fucking short son. You just imagine. Not
                even 990. I can settle with 990 because I
                know they come in short these days. I can
                settle with 990. But nine fucking thirty?
                940? That's . . . that's . . . what the
                fuck! 60 gone? 70 gone? You know what I'm
                saying? Right now I got . . . I got stock
                everyone up. I took every one out and I put
                like . . . I put it up at 995 on each of
                them. You know what I'm saying? And you
                know how much I got left over dog? 600
                grams. I have 600 grams! I have twelve and
                600 grams. You understand what I saying?

I believe VOISIN was indicating that the packages of cocaine that

he had received from SAVE-RENDON, which had been packaged in grey

duct tape, had contained less than one kilogram (1000 grams) and

that he was unhappy about this. VOISIN also discussed "Primo"

during the conversation. CI 2 has indicated that "Primo" is a

source of cocaine for SAVE-RENDON.

    e. On May 26, 2012, VOISIN again called SAVE-

RENDON. They had the following exchange:

> SAVE-RENDON: "I already saw '99' and everything."
>
> VOISIN: "Uh Yeah, 'bout to shoot out?"
>
> SAVE-RENDON: "Yeah, he told me he was going to eat in the car."

Later in the call, they had the following exchange:

> SAVE-RENDON: "I gave him, I told it was nine and a half and a total of twelve."
>
> VOISIN: "All right, cool, cool.  All right cool, cool, all right, here we go.  I got you alright.  Take it easy yo."
>
> SAVE-RENDON: "All right.  I'm gonna, I'm gonna try to get ahold of uh, the, the new load for, for next time. . . ."

I believe SAVE-RENDON is indicating that CAMACHO-RAMIREZ has just

left Arizona with a shipment containing twelve kilograms of

cocaine for VOISIN and that SAVE-RENDON would start preparing the

next load of cocaine.  On May 29, 2012, Pennsylvania State

Troopers stopped a truck driven by CAMACHO-RAMIREZ in

Pennsylvania.  CAMACHO-RAMIREZ consented to a search of the

vehicle.  During the search, officers found twelve kilograms of

cocaine in a black Adidas duffle bag located in the cab of the

truck.  CAMACHO-RAMIREZ was placed under arrest and identified as

a result of a fingerprint search.  The arrest photograph of

CAMACHO-RAMIREZ was then sent to CI 2, who indicated it to be a

picture of "99."  While CAMACHO-RAMIREZ was undergoing post-

arrest processing in the evening of May 29, 2012, CAMACHO-RAMIREZ's telephone received numerous calls from one of the telephones that VOISIN had been intercepted on.

## July 17, 2012 Narcotics Transaction

13.    On July 5, 2012, DEA Special Agents received authorization from the Honorable Margo K. Brodie to intercept wire communications of a cellular telephone utilized by VOISIN. Those wire interceptions captured discussion between SAVE-RENDON and VOISIN relating to another narcotics transaction.

14.    Specifically, on July 12, 2012, agents intercepted another call between SAVE-RENDON and VOISIN, during which they had the following exchange:

SAVE-RENDON:    Yo! You have the other one?

VOISIN:    Not now, with me right now.  What up?

SAVE-RENDON:    Cause I'm here with homeboy and . . . who wants to know . . . uh.  If you can probably can get someone to pick up like all the . . .

VOISIN:    All of them?

The call was then disconnected.  Based on my training, experience and knowledge of this investigation, I believe that VOISIN and SAVE-RENDON were discussing VOISIN picking up a shipment of narcotics.

15.    On July 17, 2012 at approximately 12:30 p.m., agents observed SAVE-RENDON arrive at 305 East 89th Street, Brooklyn, New York, a warehouse utilized by VOISIN as a narcotics

11

stash house.

16.    On July 17, 2012 at approximately 1:14 p.m.,
agents intercepted a call between VOISIN and a man identified as
"Bill", during which they discuss moving money.   During the
conversation, VOISIN states "Listen to me very carefully.   I'm
just starting [unintelligible] fucking people or nobody
[unintelligible]. I have to move the people money like
[unintelligible]. Do you understand that? I have to move the
people's money first.   Everything else comes after that, so
everybody else has to wait! Them people get the money, then I can
do whatever else I have to do.   Do yo understand?"

17.    At approximately 1:46 p.m., agents observed SAVE-
RENDON, VOISIN, and an individual later identified as MIGUEL
GONZALEZ get into the SUBJECT VEHICLE.   Approximately 3 minutes
later, VOISIN reentered 305 East 89th Street.

18.    Throughout this day, agents in Arizona intercepted
over a dozen wire communications between SAVE-RENDON and "Beto,"
whom investigation has identified as a narcotics supplier.
During the course of these wire communications, SAVE-RENDON and
"Beto" discuss the fact that SAVE-RENDON is meeting "Beto's"
worker. Specifically, they discuss that there is a Chinese
restaurant at the meet location and that "Beto's" worker will go
into the restaurant to wait.

18.    Agents then followed the SUBJECT VEHICLE and at

12

9:35 p.m., observed the SUBJECT VEHICLE in Elmwood, New Jersey. At that time SAVE-RENDON and GONZALEZ got out of the SUBJECT VEHICLE, an unidentified man then approached SAVE-RENDON. SAVE-RENDON then placed a large weighted white bag in the trunk of the SUBJECT VEHICLE. SAVE-RENDON and GONZALEZ then went into a Chinese restaurant located nearby.

19.  The unidentified man then got into a white pickup truck parked nearby and moved it into a parking spot adjacent to the SUBJECT VEHICLE. At approximately 9:44 p.m., SAVE-RENDON and GONZALEZ came out of the Chinese restaurant. SAVE-RENDON opened the trunk of the SUBJECT VEHICLE and removed a weighted black duffel bag, which he placed into the bed of the white pickup truck. Immediately after this, the white pickup truck drove away. The SUBJECT VEHICLE left a short time later.

20.  At approximately 11:17 p.m., the SUBJECT VEHICLE was observed by agents returning to the warehouse at 305 E. 89th Street. It was driven inside the bay door of the warehouse shortly after that.

21.  Based on my training and experience, I believe that SAVE-RENDON and GONZALEZ used the SUBJECT VEHICLE to drive to New Jersey for a narcotics transaction.

20.  Also on July 17, 2012, agents from Arizona intercepted a wire communication between SAVE-RENDON and "Beto" during which they discuss another narcotics transaction.

13

Specifically, SAVE-RENDON and "Beto" had the following exchange in Spanish:

| | |
|---|---|
| SAVE-RENDON: | I think he is planning that the, about the capital. Remember you told me about the capital? |
| BETO: | Uh-huh. |
| SAVE-RENDON: | That if you arrived at the capital then maybe he would head down. |
| BETO: | Yeah, yeah, I am also putting everything on my party, tell him he won't have to head down. |
| SAVE-RENDON: | Huh? |
| BETO: | Maybe I will be heading over with him, like I'll take what's mine leave it there. |
| SAVE-RENDON: | It's because, I'm going to tell you, next month, like around the 8th, he has to go to his country, it's been like ten years that he hasn't gone and he has to go over there. So then if something is going to be done, then it needs to be done over there so we can have everything liquidated before he leaves. |
| BETO: | And what about . . . when I leave, I'm going to hook him up. |

Based on my training and experience and investigation, I believe SAVE-RENDON and "Beto" were discussing engaging in another narcotics transaction with VOISIN prior to August 8, 2012. As the SUBJECT VEHICLE was used in the July 17, 2012 transaction, I believe the SUBJECT VEHICLE is likely to be used during the next narcotics transaction.

Other Use of the SUBJECT VEHICLE in Narcotics Trafficking

21.  Based on my training, experience, and

14

investigation, I believe VOISIN also regularly uses the SUBJECT VEHICLE during the course of his narcotics trafficking.

22. On July 16, 2012 at approximately 8:58 a.m. , agents observed VOISIN leave his residence at 116-28 Lovingham Place, St. Albans, New York, carrying a shopping bag and get into the SUBJECT VEHICLE. He then drove to Payomatic, a shop located at 188-34 Linden Boulevard, St. Albans, New York, which had a sign in the window for Western Union. VOISIN entered Payomatic carrying a white envelope and came out several minutes later empty handed.

23. On July 16, 2012 at approximately 11:43 a.m., agents intercepted a call between VOISIN and MARTIN LNU, during which they discussed obtaining narcotics. During the call, VOISIN and MARTIN had the following conversation:

VOISIN:       Around 4:00 O'clock this afternoon is
              alright?

MARTIN:       This afternoon?

VOISIN:       Yeah.

MARTIN:       How much?

VOISIN:       40.

MARTIN:       40? You wanna do it tomorrow morning?

VOISIN:       Alright, no problem.

MARTIN:       Tomorrow morning, ok?

VOISIN:       Alright.

Based on my training and experience and the

15

investigation that has been conducted thus far, I believe that
VOISIN was discussing the purchase of narcotics from a narcotics
supplier to be done on Saturday.

24.   On July 17, 2012 at approximately 9:44 a.m.,
agents observed VOISIN leave the warehouse at 305 East 89th
Street carrying a weighted white shopping bag and get into the
SUBJECT VEHICLE.   At approximately 9:55 p.m., VOISIN stopped at a
Western Union, which he entered and left several minutes later.
VOISIN then got back into the SUBJECT VEHICLE and traveled to
East 26th Street between Flatbush Avenue and Farragut Avenue,
Brooklyn, New York.   Agents observed VOISIN leave the SUBJECT
VEHICLE carrying a weighted white shopping bag and enter 554 East
26th Street, Brooklyn, New York.   Records checks indicate that a
telephone for JEFFREY WATSON is subscribed to at 554 East 26th
Street, Apartment 3A, Brooklyn, New York.   VOISIN's toll records
show that he has been in regular contact with WATSON. Records
checks show that WATSON has five previous arrests for narcotics
charges.

16.   As of this morning, the SUBJECT VEHICLE was
located at 116-28 Lovingham Place, St. Albans, New York.

### GPS DATA

17.   I have confirmed with DEA technicians that the GPS
mobile tracking device can be installed within the SUBJECT
VEHICLE.   The device, once installed and rendered operable,

16

generates signals that fix the geographic positions of the
SUBJECT VEHICLE.  The signals are then read by a satellite that
transmits the location information in a form that a DEA computer
program is able to calculate and project upon a map.

### GROUNDS FOR DELAYING NOTICE

18.    Pursuant to 18 U.S.C. § 3103a and 18 U.S.C.
§ 2705(a)(2), and to the extent applicable, the government seeks
authorization to delay notification to the registered owner of
the SUBJECT VEHICLE until 30 days from the date on which the
order proposed herein expires.  The grounds for this request are
as follows: the investigation of FLETCHER SALEEM VOISIN and
others is ongoing and is expected to continue for at least
another several months.  Disclosure of the warrant at this time
would cause premature termination of the investigation into
VOISIN and others, most likely cause members of the organization
to cease using their vehicles, change telephone numbers that are
being or will be monitored through subpoenas, judicially
authorized pen registers and potential wiretaps, change methods
of drug and drug proceeds shipment, and flee.

### AUTHORIZATION REQUESTED

19.    Based on the foregoing, your affiant believes that
the Requested Information will lead to evidence of criminal
activities by VOISIN and others, to include the distribution of
controlled substances.  The Requested Information is necessary in

order to determine the exact location of the SUBJECT VEHICLE so
that law enforcement agents can: (a) monitor the movements of the
SUBJECT VEHICLE after it leaves 116-28 Lovingham Place, St.
Albans, New York and/or departs the Eastern District of New York;
(b) track the SUBJECT VEHICLE's travel without the need for close
proximity vehicle surveillance; and (c) identify locations where
the SUBJECT VEHICLE is taken to deliver drug proceeds.  The
Requested Information will therefore allow law enforcement agents
to observe members of VOISIN's drug trafficking organization
safely and continuously, and enable them to stop and potentially
arrest those individuals who are using the SUBJECT VEHICLE to
commit the TARGET OFFENSES.

     20.  WHEREFORE, pursuant to Federal Rule of Criminal
Procedure 41(b), Title 18, United States Code, Section 3117, and
Title 28, United States Code, Section 1651, it is requested that
the Court issue a warrant and Order authorizing the installation
and monitoring of one GPS mobile tracking device in or on the
SUBJECT VEHICLE by trained DEA technicians or by an individual or
individuals working under their direct supervision in order to
monitor the movement of the SUBJECT VEHICLE for a period of
forty-five (45) days.

     21.  IT IS FURTHER REQUESTED that the Court authorize
trained DEA technicians or an individual or individuals working
under their direct supervision to enter private property to

install the GPS mobile tracking device.

22.  IT IS FURTHER REQUESTED that the Court authorize technicians and agents with the DEA or their authorized representatives to monitor the signals from the GPS mobile tracking device installed within the SUBJECT VEHICLE for a period of forty-five (45) days following the issuance of the Court's Order, including signals produced both during daytime and nighttime, inside private locations, and other places not open to the public or visual surveillance, and signals produced in the event that the SUBJECT VEHICLE leaves the Eastern District of New York, but remains within the United States.

23.  IT IS FURTHER REQUESTED that the Court authorize technicians and agents with the DEA or an individual or individuals operating under their direct supervision to surreptitiously access the SUBJECT VEHICLE in the Eastern District of New York in order to install, repair, replace or remove the GPS mobile tracking device including in the event the SUBJECT VEHICLE travels to private locations, other places not open to the public or visual surveillance, and in the event that the SUBJECT VEHICLE leaves the Eastern District of New York, but remains within the United States.  As the SUBJECT VEHICLE may become located somewhere that precludes surreptitiously accessing the vehicle during daytime, it is further requested that the Court authorize this access to occur at any time of the day or

19

night.

24. IT IS FURTHER REQUESTED that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others, except that working copies should be made available to the United States Attorney's Office, DEA, and any other law enforcement agency designated by the United States Attorney's Office, and that the Court require the return of this warrant -- and any notification required under 18 U.S.C. § 3103a and 18 U.S.C. § 2705(a)(2) -- to occur within 30 days after the use of the tracking device has ended unless extended by the Court for good cause shown.

Dated:     Brooklyn, New York
           July 26, 2012

                                        EDWARD PIESZCHATA
                                        Special Agent
                                        Drug Enforcement Administration

Sworn before me this
26th day of July, 2012

      s/Joan M. Azrack

THE HONORABLE JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

20

JDL:TJS

- - - - - - - - - - - - - - - - - - -x

**12 MISC 493**

IN THE MATTER OF AN APPLICATION OF
THE UNITED STATES OF AMERICA FOR AN
ORDER AUTHORIZING THE INSTALLATION,
USE, MONITORING, REPAIR, REPLACEMENT
AND REMOVAL OF:

ONE MOBILE GPS TRACKING DEVICE IN OR
ON A GREY 2012 MERCEDES BENZ ML 350,
VIN #4JGDA5HB5CA011779

**SEALED ORDER**

- - - - - - - - - - - - - - - - - - -X

      Application having been made by the United States for
an Order pursuant to 18 U.S.C. § 3117, 28 U.S.C. § 1651, and
Federal Rule of Criminal Procedure 41, authorizing the
installation and monitoring of one Global Positioning System
("GPS") mobile tracking device to be installed by trained
technicians, or authorized representatives of the Drug
Enforcement Administration ("DEA") in or on A GREY 2012 MERCEDES
BENZ ML 350, VIN #4JGDA5HB5CA011779 registered to Arleana B.
Pierre, 116-28 Lovingham Place, St. Albans, New York 11412, with
New York License plates FCM4328 (the "SUBJECT VEHICLE"), which is
currently located in the Eastern District of New York, in order
to monitor the movement of the SUBJECT VEHICLE (the "Requested
Information"), for a period of forty-five (45) days;

The Court finds that there is probable cause to believe that the Requested Information will lead to evidence of violations of Title 21, United States Code, Sections 841 and 846, among other offenses, as well as to the identification of individuals who are engaged in the commission of these offenses.

IT IS HEREBY ORDERED pursuant to 18 U.S.C. § 3117, 28 U.S.C. § 1651, and Federal Rule of Criminal Procedure 41, that technicians and agents with the DEA or individuals working under their direct supervision may install one GPS mobile tracking device in or on the SUBJECT VEHICLE in order to monitor the movement of the SUBJECT VEHICLE for a period of forty-five (45) days.

It is further ORDERED that technicians and agents with the DEA may monitor the signals from the GPS mobile tracking device installed in or on the SUBJECT VEHICLE for a period of forty-five (45) days following the issuance of the Court's Order, including signals produced inside private locations, and other places not open to the public or visual surveillance, and signals produced in the event that the SUBJECT VEHICLE leaves the Eastern District of New York, but remains within the United States.

It is further ORDERED that technicians and agents with the DEA or an individual or individuals operating under their direct supervision are authorized to surreptitiously access the SUBJECT VEHICLE in the Eastern District of New York at any time

-2-

of the day or night in order to install, repair, replace or remove the GPS mobile tracking device including in the event that the SUBJECT VEHICLE travels to private locations, other places not open to the public or visual surveillance, and in the event that the SUBJECT VEHICLE leaves the Eastern District of New York, but remains within the United States.

It is further ORDERED that the Court's Order and the accompanying Affidavit submitted in support thereof, as they reveal an ongoing investigation, be sealed until further Order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others, except that copies of the Court's Order in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers as necessary to effectuate the Court's Order.

It is further ORDERED that this warrant be returned to the U.S. Magistrate Judge on criminal duty in the Eastern District of New York within 30 days after the use of the tracking device has ended as required by law. Notice of the execution of

-3-

this warrant otherwise required by Fed. R. Crim. P. 41 may be extended by the Court for good cause shown.

It is further ORDERED that, pursuant to 18 U.S.C. §§ 2705(a)(2) and 3103(a), service of notice may be delayed for a period of thirty (30) days after the use of the tracking device has ended unless extended by the Court for good cause shown.

Dated:    Brooklyn, New York
          July 26, 2012

s/Joan M. Azrack

THE HONORABLE JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

-4-